# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

KENNETH CARR, individually and on behalf of all others similarly situated, and derivatively on behalf of nominal defendant ADVANCED CARDIAC THERAPEUTICS, INC.,

Plaintiff,

v.

C.A. No. 2017-0381-AGB

NEW ENTERPRISE ASSOCIATES, INC., PETER JUSTIN KLEIN, ROY T. TANAKA, DUKE S. ROHLEN, ARIS CONSTANTINIDES, WILLIAM OLSON, MICHAEL J. PEDERSON, NEW ENTERPRISE ASSOCIATES 14, L.P., NEA PARTNERS 14, LIMITED PARTNERSHIP, NEA 14 GP, LIMITED PARTNERSHIP, NEA VENTURES 2014, LIMITED PARTNERSHIP, AND DUKE ROHLEN AND KENDALL SIMPSON ROHLEN, AS TRUSTEES OR SUCCESSOR TRUSTEE, OF THE ROHLEN REVOCABLE TRUST DATED U/A/D 6/12/98,

Defendants,

and

ADVANCED CARDIAC THERAPEUTICS, INC.

Nominal Defendant.

MEMORANDUM OPINION

Date Submitted:  December 8, 2017
Date Decided:  March 26, 2018

T. Brad Davey and Matthew A. Golden of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Barry S. Pollack and Joshua L. Solomon of POLLACK SOLOMON DUFFY LLP, Boston, Massachusetts; *Counsel for Plaintiff.*

Herbert W. Mondros and Krista R. Samis of MARGOLIS EDELSTEIN, Wilmington, Delaware; *Counsel for Defendants Peter Justin Klein, Roy Tanka, Duke Rohlen, Aris Constantinides, William Olson, Michael Pederson, Duke Rohlen and Kendall Simpson Rohlen, as Trustees or Successor Trustee of the Rohlen Revocable Trust Dated U/A/D 6/12/98, and Nominal Defendant Advanced Cardiac Therapeutics, Inc.*

Michael F. Bonkowski and Nicholas J. Brannick of COLE SCHOTZ P.C., Wilmington, Delaware; Roger A. Lane, Courtney Worcester, and Jasmine D. Coo of FOLEY & LARDNER LLP, Boston, Massachusetts; Angelica Boutwell of FOLEY & LARDNER LLP, Miami, Florida; *Counsel for Defendants New Enterprise Associates, Inc., New Enterprise Associates 14, L.P., NEA Partners 14, Limited Partnership, NEA 14 GP, Limited Partnership, NEA Ventures 2014 Limited Partnership.*

**BOUCHARD, C.**

This action involves a dispute between Kenneth Carr, a co-founder of Advanced Cardiac Therapeutics, Inc. ("ACT" or the "Company"), and its controlling stockholder, New Enterprise Associates, Inc. ("NEA"). ACT is a pre-commercial medical device company. NEA holds itself out as one of the largest venture capital firms in the world and has investments in a large portfolio of companies.

In April 2014, NEA became ACT's controlling stockholder as a result of the sale of Series A-2 preferred stock that was offered to a select group of investors. Carr was not among them. The Series A-2 offering implied a value for ACT of approximately $15 million. In October 2014, ACT sold a warrant to Abbott Laboratories ("Abbott") for $25 million, giving it the option to purchase all of ACT's equity for a 30-month period for up to $185 million. In the interim between the Series A-2 offering and the warrant sale to Abbott, another medical device company made a proposal to acquire ACT for up to $300 million, but that overture was not pursued. In 2016, ACT repurchased the warrant from Abbott for $25 million in cash and a note as part of a "settlement agreement."

Critical to this case, the 2014 warrant transaction with Abbott was conditioned on Abbott acquiring another company, Topera, in which NEA was the largest institutional investor. NEA also was the largest institutional investor in VytronUS, a company for which Abbott provided funding simultaneously with the warrant transaction. The gravamen of Carr's complaint is twofold: (1) that the Series A-2

offering that allowed NEA to become ACT's controlling stockholder was approved by a conflicted board and severely undervalued ACT; and (2) that NEA orchestrated the potential sale of ACT to Abbott on the cheap as part of a strategy to optimize the value of its portfolio by inducing Abbott to acquire Topera and invest in VytronUS.

Carr's complaint asserts various claims on behalf of a putative class of stockholders (and, alternatively, derivatively) for breach of fiduciary duty and/or aiding and abetting against ACT's directors at the time of the challenged transactions and NEA. Defendants have moved to dismiss. For the reasons explained below, the motion is denied in large part, although certain claims and parties will be dismissed because of various pleading deficiencies.

## I.   BACKGROUND

Unless noted otherwise, the facts in this decision are drawn from the Verified Class Action and Derivative Complaint (the "Complaint") and documents incorporated therein,[1] which include documents produced to plaintiff in response to a books and record demand made under 8 *Del. C.* § 220.[2] Any additional facts are either not subject to reasonable dispute or subject to judicial notice.

---

[1] *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013) (citations omitted) ("[P]laintiff may not reference certain documents outside the complaint and at the same time prevent the court from considering those documents' actual terms" in connection with a motion to dismiss).

[2] Compl. (Dkt. 1). Some of the Section 220 documents were filed with the court via the Transmittal Affidavit of Sarah M. Ennis ("Ennis Aff.") (Dkt. 34) and the Transmittal Affidavit of Matthew A. Golden ("Golden Aff.") (Dkt. 40). The parties have a qualified

## A. The Parties and Relevant Non-Parties

Plaintiff Kenneth Carr is an inventor in the area of microwave radiometry technology and ablation catheter devices. In or about 2007, he co-founded nominal defendant Advanced Cardiac Therapeutics, Inc. At all relevant times, Carr held approximately 960,000 shares of ACT common stock. When the Company was founded, Carr held an approximately 30% interest in ACT. Subsequent rounds of financing have diluted that interest.

The Company is a Delaware, pre-commercial, medical device company that designs and manufactures a catheter-based system for the treatment of patients with atrial fibrillation, commonly known as AFIB, which is characterized by an irregular, often rapid heart rate. ACT collaborates with and licenses technology from Meridian Medical Systems, another company that Carr founded.

Defendant NEA is a Delaware corporation that holds itself out as the world's largest venture capital fund with more than $17 billion in committed capital across fifteen funds. Defendants New Enterprise Associates 14, L.P., NEA Partners 14, Limited Partnership, NEA 14 GP, Limited Partnership, and NEA Ventures 2014,

---

agreement that, if a Section 220 document is relied upon in a later complaint, all documents produced in response to that category of documents shall be incorporated by reference in the complaint. Golden Aff. Ex. H ¶ 8. The agreement, however, does not specifically address whether the court may assume the truth of information in the documents in that circumstance. Accordingly, while I consider the actual terms of these documents, I do not assume their truth.

Limited Partnership are limited partnerships controlled by NEA. I refer to these entities hereafter, collectively, as "NEA" and, at times, to one or more of them as an "NEA entity" or "NEA entities."

NEA holds interests in numerous "portfolio companies" in addition to ACT. Relevant to this action, in or about April 2013, NEA and an affiliate of Abbott co-invested in Topera, a cardiac arrhythmia mapping company that specializes in mapping electrical signals of the heart. Another NEA portfolio company relevant to this action is known as VytronUS, which describes itself as having been "formed in 2006 to harness the imaging and therapeutic capabilities of ultrasound energy to treat cardiac arrhythmias, starting with atrial fibrillation."[3] ACT's outside counsel regularly represents and advises NEA.

NEA became ACT's controlling stockholder in April 2014 as a result of its purchase of Series A-2 preferred stock, defined below as the "Series A-2 Financing." Carr contends that, even before the Series A-2 Financing, NEA and defendants Duke S. Rohlen and Kendell Simpson Rohlen, as Trustees or Successor Trustee, of the Rohlen Revocable Trust Dated U/A/D 6/12/98 (the "Trust"), together constituted the controlling stockholder of ACT.[4]

---

[3] *About Us: Company*, VYTRONUS, http://www.vytronus.com/company.html (last visited Mar. 23, 2018).

[4] *See infra.* III.C.1.

The Complaint names as defendants the following six individuals who constituted the six members of ACT's board of directors (the "Board") at the time of the challenged transactions (*i.e.*, the Series A-2 Financing and, as defined below, the Warrant Transaction): Peter Justin Klein, Roy T. Tanaka, Duke S. Rohlen, Aris Constantinides, William Olson, and Michael J. Pederson (collectively, the "Director Defendants"). Three of these individuals (Klein, Tanaka, and Rohlen) remained on the Board when this action was filed, while the other three (Constantinides, Olson, and Pederson) had left the Board by that date. At the time the Complaint was filed, the Board consisted of Klein, Tanaka, Rohlen, and non-party Ryan Drant.

The Complaint describes a variety of affiliations between and among the Director Defendants and NEA apart from their service as directors of the Company, including the following:

- **Peter Justin Klein** is a partner on NEA's healthcare team who has served at various times on the boards of numerous NEA portfolio companies, including Topera and VytronUS.

- **Roy T. Tanaka** has served at relevant times on the board of VytronUS.

- **Duke S. Rohlen** was appointed to serve as the Company's President and CEO on March 11, 2014, at which time he was serving as ACT's Chairman of the Board. At that time, Rohlen also served as the CEO of Ajax Vascular, another NEA portfolio company. In addition, Rohlen previously served as CEO of

5

CV Ingenuity and the President of FoxHollow Technologies, two other NEA portfolio companies. NEA has held Rohlen out as a "serial entrepreneur within the NEA family."[5]

- **Aris Constantinides** was a venture capital fund partner at an entity known at the time as NBGI, the private equity arm of the National Bank of Greece. Constantinides is connected to NEA and Klein through various venture capital investments in the medical device industry. NEA permitted NBGI to participate in the Series A-2 Financing.

- **William Olson** was the Company's CEO before Rohlen. Olson was removed as CEO pursuant to a March 2014 Separation Agreement. Olson and ACT also are parties to a Consulting Agreement.[6] Olson served previously as a Vice President at FoxHollow Technologies.

- **Michael J. Pederson** served, at relevant times, as the President and CEO of VytronUS.

---

[5] Compl. ¶ 28.

[6] The Consulting Agreement made Olson report to Rohlen and provided compensation to Olson in the form of a $60,000 lump-sum payment and non-statutory options equal to 2% of the Company's fully diluted capitalization subject to approval by the Board. The options would not vest for five months from the effective date of the Consulting Agreement (March 1, 2014) and would vest only if Olson continued to provide services. Compl. ¶¶ 30, 45.

6

**B.     NEA's Early Involvement in ACT**

In January 2014, an NEA entity purchased Series A-1 preferred stock from the Company and entered into an Amended and Restated Voting Agreement (the "Voting Agreement").[7]   The Complaint alleges that, following the Series A-1 transaction, "NEA began causing changes in the Company's management to further increase its power over the Company."[8]

In March 2014, Olson was removed as CEO and replaced by Rohlen, although Olson stayed on as a director and consultant.  At this time, NEA and the Trust together held a majority of the Company's preferred stock, which had the right to appoint two of the seven director positions on the Board.[9]  On or about March 17, 2014, an NEA entity and the Trust amended the Voting Agreement to provide that one of the preferred designees to the Board would be Pederson, and the other director seat would remain vacant.[10]

**C.     The Series A-2 Financing**

On April 2, 2014, the Board—composed of the six Director Defendants— signed a written consent (the "April 2014 Consent") providing for the issuance of 265,780,730 shares of Series A-2 preferred stock for $0.0301 per share (the "Series

---

[7] *See* Golden Aff. Ex. C. at ACT_220_000016 (first recital).

[8] Compl. ¶ 44.

[9] Golden Aff. Ex. C.

[10] Golden Aff. Ex. C.

A-2 Financing"). This issuance placed a valuation on the Company of approximately $15 million. NEA obtained nearly 90% of the Series A-2 preferred stock, which, combined with its other equity holdings, resulted in NEA acquiring more than 65% of ACT's stock on an as-converted basis and becoming its controlling stockholder. The Series A-2 preferred stock was not offered to more than 30 stockholders who previously invested in Act, including Carr.

The April 2014 Consent expressly acknowledges that four of the six directors who approved the Series A-2 Financing participated in the transaction personally or through entities in which they had material financial interests:

> It is hereby disclosed or made known to the Board that (i) Aris Constantinides is a director of the Company and is associated with, and/or has a material financial interest in NBGI Technology Fund II, L.P., or its affiliates ("**NBGI**"); (ii) Justin Klein is a director of the Company and is associated with, and/or has a material financial interest in New Enterprise Associates 14, L.P. ("**NEA**"), (iii) Duke Rohlen is a director and officer of the Company, and (iv) Michael Pederson is a director of the Company, such that the Financing is an Interested Party Transaction since NBGI, NEA, Duke Rohlen and Michael Pederson will be participating in the Financing.[11]

On April 3, 2014, the day after the Board approved the Series A-2 Financing, an NEA entity executed a new Amended and Restated Voting Agreement with

---

[11] Ennis Aff. Ex. 3 at ACT_220_000038 (emphasis in original); Compl. ¶¶ 26, 28, 29, 31, 54. According to defendants, NBGI ultimately did not participate in the Series A-2 Financing. NEA Defs.' Opening Br. 29 n.15 (Dkt. 35); Ennis Aff. Ex. 11 at ACT_220_000844-45.

certain other ACT stockholders (the "Restated Voting Agreement"), which provides for the seven positions on the Board to be selected as follows:[12]

- **The Rohlen Designee**:  Rohlen was entitled to appoint a director as long as he or his affiliate continued to hold at least 25% of his originally acquired Series A-1 preferred shares.  He appointed himself.

- **The NEA Designee**:  An NEA entity was entitled to appoint a director as long as it or its affiliate continued to hold at least 25% of its originally acquired Series A-1 preferred shares.  It appointed Klein.

- **The Series 1 Designee**:  The holders of the Series 1 preferred stock were entitled to appoint a director. NBGI held a majority of these shares and appointed Constantinides.

- **The CEO Designee**:  The CEO Designee was the then-serving CEO, which was Olson.

- **The Preferred Designees**:  The holders of the preferred stock were entitled to appoint two directors.  NEA held a majority of the preferred stock and it appointed Pederson and left one vacancy.

- **The Mutual Designee**:  This director was to be appointed unanimously by the other directors serving at that time.  The other directors appointed Tanaka.

---

[12] Compl. ¶ 52; Golden Aff. Ex. A at ACT_220_000147-50.

The Restated Voting Agreement also provided drag-along rights that permitted the holders of a majority of ACT's preferred stock on an as-converted basis—at that time, NEA—to cause other stockholders to vote in favor of a sale of the Company.

After the Series A-2 Financing, the Board granted Rohlen and Pederson options, 23,256,940 and 13,954,164, respectively, with a retroactive vesting schedule that started on October 2, 2013. Rohlen exercised his options on or about July 8, 2014, and Pederson exercised his options on or about June 4, 2014, which, according to the Complaint, was "contrary" to their vesting schedules.[13]

### D. Abbott and Medtronic Make Proposals to Acquire the Company

On June 30, 2014, Abbott submitted a letter of intent for an option to purchase ACT. In the letter of intent, Abbott proposed a $25 million purchase price for a warrant (the "Warrant") with a $75 million exercise price and up to $85 million in potential milestone payments, for total consideration up to $185 million.[14] The proposal was conditioned on the completion of Abbott's purchase of Topera.

The June 30 proposal included an exclusivity period of up to 60 days for Abbott and ACT to negotiate a transaction, but also recognized that ACT had an agreement with Medtronic, an Abbott competitor, which required ACT to give Medtronic notice of certain proposals. Specifically, the June 30 proposal included a

---

[13] Compl. ¶¶ 56-57.

[14] Compl. ¶ 59; Ennis Aff. Ex. 4.

provision contemplating that ACT would negotiate exclusively with Abbott "except as may otherwise be required to comply with the terms . . . of that certain Master Development Agreement, dated July 2013 (as amended to extend its term to July 26, 2015), between ACT and Medtronic, Inc."[15]

On July 12, 2014, Abbott submitted an updated letter of intent proposing the same high-level economic terms, *i.e.*, a $25 million purchase price for a warrant with a $75 million exercise price and up to $85 million in potential milestone payments, for total consideration up to $185 million.[16] The July 12 proposal also was conditioned on the completion of Abbott's proposed purchase of Topera and contained the same exclusivity language as the June 30 proposal.[17]

Later on July 12, 2014, the Board met telephonically and discussed Abbott's July 12 letter of intent and the timing of Medtronic's right to receive notice under the Company's agreement with Medtronic. Five of the six ACT directors participated in the meeting; Tanaka was not present.[18] The Board approved the July 12 letter of intent at the July 12 meeting before giving notice to Medtronic.

On or about July 25, 2014, after ACT gave Medtronic the required notice and during Abbott's 60-day exclusivity period, Medtronic submitted its own letter of

---

[15] Ennis Aff. Ex. 4 § 8.

[16] Compl. ¶ 60; Ennis Aff. Ex. 5.

[17] Compl. ¶ 60; Ennis Aff. Ex. 5 § 8.

[18] Ennis Aff. Ex. 6.

11

intent for an option to buy the Company. The Medtronic letter of intent proposed a $30 million payment for an option with a $100 million exercise price, and milestone payments that could bring the total payments up to $300 million.[19] Medtronic's proposal was not conditioned on Medtronic's purchase of any other entity.

### E. NEA Executes Three Simultaneous Transactions with Abbott

On October 14, 2014, the Board met and discussed a series of transactions in which Abbott would purchase the Warrant (the "Warrant Transaction"), acquire Topera, and invest in VytronUS. The Warrant Transaction was conditioned expressly on the sale of Topera to Abbott.[20] At the time, NEA was the largest and only institutional investor in Topera alongside Abbott.

During the October 14 Board meeting, Pederson formally disclosed that he was the President and CEO of VytronUS and was discussing potential employment with Abbott.[21] Klein disclosed that he, as a NEA partner, had a material interest in the Topera and VytronUS portions of the deal. The Board then voted to approve the Warrant Transaction but did not submit it to a full stockholder vote.

---

[19] Compl. ¶ 61; Ennis Aff. Ex. 7 §§ 1, 3.

[20] Compl. ¶ 66.

[21] Compl. ¶ 66. After the Warrant Transaction, Pederson began to work for Abbott while also sitting on the Board. Compl. ¶¶ 31, 71, 74.

12

The Warrant, dated October 27, 2014,[22] locked up ACT for a potential purchase by Abbott until March 2017. It also included terms that would have allowed for a distribution by ACT of up to $12.5 million of the $25 million payment by Abbott, although no distribution is alleged to have occurred.[23]

NEA issued a public announcement concerning the Warrant Transaction and the transactions involving Topera and VytronUS, which stated:

> With NEA as the largest institutional investor in each of these companies—and the only investor to be involved in all three—we are proud to share some insight into this seemingly unprecedented suite of transactions that, for the first time in the medical device sector's history, feature a large corporate acquirer partnering with multiple portfolio companies in a single VC's portfolio to establish a path to building a market leader in a major diagnostic and therapeutic category.[24]

The announcement also lauded "NEA's internal legal and accounting teams and the outside firms who advised each company involved in these transactions."[25] The Complaint alleges that, "[a]s a result of NEA's three-headed deal with Abbott, NEA and its affiliates enjoyed a $250 million payment from Abbott for Topera," and that VytronUS "received $31.5 million in funding from Abbott's investment arm, Abbott Ventures."[26]

---

[22] Ennis Aff. Ex. 9 at ACT_220_000270.

[23] Compl. ¶ 75.

[24] Compl. ¶ 70.

[25] Compl. ¶ 70.

[26] Compl. ¶¶ 13, 84.

The mechanics of how an exercise of the Warrant would allow Abbott to gain 100% control of ACT's equity are not clear from the pleadings, but the terms of the Warrant agreement provide that a group of "Key Stockholders,"[27] collectively holding not less than 89% of outstanding Company common stock on an as-converted basis, would sign a stockholders agreement with Abbott.[28] ACT also agreed that "[t]he Company shall have taken all actions necessary to cause each Equity Participation Right of the Company that is outstanding immediately prior to the Warrant Exercise Closing and has not been exercised to be cancelled, terminated and no longer outstanding."[29] Thus, the terms of the Warrant indicate, consistent with the Complaint, that Abbott's exercise of the Warrant would result in Abbott acquiring complete control of ACT.

## F. ACT Repurchases the Warrant

In 2016, Abbott acquired St. Jude Medical, which also had an ablation catheter business. The Federal Trade Commission "took issue with Abbott's plan to purchase

---

[27] "Key Stockholders" is defined to include an NEA entity, NBGI, Rohlen, the Trust, Olson, Pederson, and Tanaka. Ennis Aff. Ex. 9 at ACT_220_000284.

[28] *Id*. at ACT_220_000301 (Art. 2.1(f)).

[29] *Id*. at ACT_220_000308 (Art. 2.3(b)(xi)). "Equity Participations" is defined to mean "any . . . share, security, equity participation right and any other present or future right entitling the holder, absolutely or contingently . . . , to participate in the equity ownership, dividends or equity appreciation" of ACT. *Id*. at ACT_220_000280.

St. Jude Medical, finding that, in light of Abbott's right to purchase ACT's business, the acquisition of St. Jude Medical would substantially lessen competition."[30]

In October 2016, ACT and Abbott entered into a "settlement agreement" in which ACT agreed to repurchase the Warrant, paying Abbott $6 million in cash and $19 million via a secured promissory note—the same total amount as the original purchase price of the Warrant.[31]  On or about December 27, 2016, Abbott reached an agreement with the FTC that allowed its proposed acquisition of St. Jude Medical to proceed, with Abbott agreeing not to purchase any product line from ACT without giving prior notice to the FTC.

## II.   PROCEDURAL HISTORY

On May 18, 2017, Carr filed the Complaint, asserting six claims, all of which are premised on the same theory:  that the Series A-2 Financing impermissibly diluted ACT stockholders and allowed NEA to gain control of the Company for less than fair value, and that NEA used its control to sell the Warrant to Abbott at an unreasonably low price in order to facilitate the Topera and VytronUS transactions for NEA's benefit.[32]  Carr views the Series A-2 Financing and the Warrant

---

[30] Compl. ¶ 79.

[31] Compl. ¶ 81.

[32] Compl. ¶¶ 1, 105.

Transaction as part of a "unitary plan" that he challenges together in six claims, pled directly and, in the alternative, derivatively.

Counts I and IV assert directly and derivatively, respectively, that NEA breached its fiduciary duty as the controlling stockholder of the Company.[33] Counts II and V assert, directly and derivatively, respectively, that the Director Defendants breached their fiduciary duties.[34] Counts III and VI assert, directly and derivatively, that NEA aided and abetted the Board's breach of its fiduciary duty.[35] Carr did not make a demand on the Board with respect to any putative derivative claims, arguing that such a demand would have been futile.[36]

On July 25, 2017, the Director Defendants filed a motion to dismiss under Court of Chancery Rules 12(b)(6) and 23.1 for failure to state a claim and failure to make a demand on the Board.[37] On July 26, 2017, NEA filed an analogous motion.[38] The court heard argument on the motions on November 7, 2017, during which the

---

[33] Compl. ¶¶ 108-11, 120-23.

[34] Compl. ¶¶ 112-14, 124-26.

[35] Compl. ¶¶ 115-19, 127-31.

[36] Compl. ¶¶ 100-07.

[37] Dkt. 33.

[38] Dkt. 35.

court requested supplemental briefing on whether *Revlon* duties apply to the Warrant Transaction.[39]  The supplemental submissions were filed on December 8, 2017.[40]

## III.  ANALYSIS

A threshold issue to analyzing the six claims in the Complaint is whether the Series A-2 Financing and Warrant Transaction should be analyzed together as part of a unitary plan, as Carr proposes, or as separate transactions, as defendants argue. I address this issue first.

### A.  The Series A-2 Financing and the Warrant Transaction Shall Be Treated as Separate Transactions

Delaware courts sometimes will view multiple transactions as part of a unitary plan under the step-transaction doctrine, which "treats the 'steps' in a series of formally separate but related transactions involving the transfer of property as a single transaction, if all the steps are substantially linked.  Rather than viewing each step as an isolated incident, the steps are viewed together as components of an overall plan."[41]  This doctrine applies if the transactions at issue meet one of three tests:

> First, under the end result test, the doctrine will be invoked if it appears that a series of separate transactions were prearranged parts of what was a single transaction, cast from the outset to achieve the ultimate result. Second, under the interdependence test, separate transactions will be

---

[39] Dkt. 53.  *See Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1986).

[40] Dkts. 60-61.

[41] *Noddings Inv. Grp., Inc. v. Capstar Commc'ns, Inc.*, 1999 WL 182568, at *6 (Del. Ch. Mar. 24, 1999) (citation and internal quotation marks omitted).

treated as one if the steps are so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series. The third and most restrictive alternative is the binding-commitment test under which a series of transactions are combined only if, at the time the first step is entered into, there was a binding commitment to undertake the later steps.[42]

I decline to view the Series A-2 Financing and the Warrant Transaction as a single transaction because, under the facts alleged, none of the three tests has been met. The binding commitment test does not apply because Carr has not alleged that there was a contractual tie between the two transactions. The interdependency test does not compel aggregation because the Series A-2 Financing and the Warrant Transaction were executed about seven months apart and each transaction had its own standalone strategic business rationale.[43] Finally, the end result test has not been met because Carr's allegations that the two transactions were part of a unitary plan "*cast from the outset to achieve the ultimate result*" are wholly conclusory.[44]

---

[42] *Bank of New York Mellon Tr. Co., N.A. v. Liberty Media Corp.*, 29 A.3d 225, 240 (Del. 2011) (citations and internal quotation marks omitted).

[43] *See Liberty Media Corp. v. Bank of New York Mellon Tr. Co., N.A.*, 2011 WL 1632333, at *16 (Del. Ch. Apr. 29, 2011) ("Each of the transactions was a distinct corporate event separated from the others by a matter of years. . . . Each of the transactions stood on its own merits. None was so interdependent on another that it would have been fruitless in isolation.").

[44] *Bank of New York Mellon v. Liberty Media*, 29 A.3d at 240 (emphasis added). *See In re Nat'l Auto Credit, Inc. S'holders Litig.*, 2003 WL 139768, at *9 (Del. Ch. Jan. 10, 2003) (citations omitted) ("In deciding whether to consider a sequence of transactions separately or collectively, the Court reviews the circumstances surrounding the challenged transaction, as alleged by the particularized facts of the complaint, to decide whether it can be reasonably inferred that those transactions constituted a single, self-interested scheme. The timing of the transactions factors significantly into the Court's decision.").

18

Carr simply has not alleged a reasonably conceivable set of facts supporting an inference that NEA and the Director Defendants concocted a scheme *as of April 2014* to: (1) allow NEA to gain control of ACT while diluting the other stockholders; and (2) use NEA's control of the Company as a bargaining chip with Abbott *almost seven months later* to facilitate Abbott's transactions with two other NEA portfolio companies.[45]  Accordingly, the ensuing analysis focuses on each of the transactions individually.[46]

## B.    The Warrant Transaction Claims are not Moot

Viewing the transactions separately, defendants assert that the claims regarding the Warrant Transaction are moot because Abbott never exercised the Warrant, which ACT repurchased in 2016.  I disagree.

"Under Delaware law, a plaintiff's cause of action accrues at the moment of the wrongful act—not when the harmful effects of the act are felt—even if the

---

[45] *Cf. Nat'l Auto*, 2003 WL 139768, at *9 & n.58 (finding a single plan where "the resolutions were adopted at the same meeting, within minutes of each other . . . as a *quid pro quo*, and, as they amount to a single plan furthering the individual interests of the Defendant Directors, they are to be considered together for purposes of deciding demand futility").

[46] Carr argues that "[a]t the very least, discovery should be allowed into the relationship between NEA and Abbott at Topera before foreclosing the conceivability that the NEA-Abbott relationship had been developing . . .  by the time of the time of the A-2 dilution." Pl.'s Answering Br. 47 (Dkt. 40).  Because Carr has stated claims challenging the Series A-2 Financing and the Warrant Transaction separately, discovery into both transactions will proceed and the court may revisit later whether a factual basis exists to view both transactions as part of a unitary plan.

19

plaintiff is unaware of the wrong."[47] Any challenge to the Warrant Transaction thus accrued upon the execution of the underlying transaction, and not upon a later exercise of the Warrant. Accordingly, even if the Warrant was never exercised, any claims relating to its issuance would not be rendered moot. The court's reasoning in *In re Sirius XM Shareholder Litigation* is instructive on this point.[48]

In that case, Sirius XM Radio Inc. negotiated an Investment Agreement in 2009 whereby Liberty Media received preferred stock in Sirius that was convertible into a 40% common equity interest.[49] Sirius also negotiated contractual provisions limiting Liberty Media's ability to take control of Sirius for three years, but once that standstill period expired, the Investment Agreement prohibited Sirius from using a poison pill or any other charter or bylaw provision to interfere with Liberty Media's ability to purchase additional Sirius stock.[50] In 2012, after the standstill period expired, Liberty Media announced its intention to acquire majority control of Sirius.[51]

After this announcement, Sirius stockholders filed suit, complaining that the Sirius board had breached its fiduciary duty by adhering to the contract with Liberty

---

[47] *In re Coca-Cola Enters., Inc.*, 2007 WL 3122370, at *5 (Del. Ch. Oct. 17, 2007).

[48] 2013 WL 5411268 (Del. Ch. Sept. 27, 2013) (Strine, C.).

[49] *Id*. at *1.

[50] *Id*.

[51] *Id*.

Media and not blocking its takeover attempt.[52]  Chief Justice Strine, writing as

Chancellor, held that plaintiffs' claims for breach of fiduciary duty were time-barred

because they had accrued over three years earlier in 2009 when Sirius and Liberty

Media entered into the Investment Agreement:

> Here, the board made the decision to take Liberty Media's capital in 2009, and, in an arm's-length transaction, agreed that in exchange they would not adopt a poison pill or any other anti-takeover measures against Liberty Media after the standstill period expired.  The terms of that deal were fully disclosed in 2009.  The board's actions in 2012 were anticipated by and, in fact, required under the Investment Agreement.  Therefore, the board's inability to block Liberty Media's so-called "creeping takeover" was merely the manifestation of the bargain struck between Sirius and Liberty Media in 2009.  If the plaintiffs ever had a meritorious claim that the Anti-Takeover Provisions in the Investment Agreement were enforceable . . . then they had it in 2009.[53]

Applying the logic of the *Sirius* court here, an exercise of the Warrant by

Abbott merely would have been a product of the bargain it struck with ACT in

October 2014.  Any potential breach of fiduciary duty with respect to the Warrant

Transaction thus occurred then, irrespective of whether Abbott actually exercised

the Warrant at some later time.  To be sure, quantifying the damages resulting from

entering into the Warrant Transaction may be a difficult task, but that does not mean

that a breach of fiduciary duty claim challenging the transaction becomes moot just

---

[52] *Id.*

[53] *Id.* at *5.

21

because the Warrant was never exercised. Accordingly, I decline to dismiss the claims challenging the Warrant Transaction on mootness grounds.

I turn next to considering whether the claims challenging the Series A-2 Financing and the Warrant Transaction are direct or derivative.

### C. The Series A-2 Financing Claims are Derivative and the Warrant Transaction Claims are Direct

"In every case the court must determine from the complaint whether the claims are direct or derivative."[54] Whether a claim is direct or derivative "must turn *solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"[55] "[A] court should look to the nature of the wrong and to whom the relief should go. The stockholder's claimed direct injury must be independent of any alleged injury to the corporation. The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation."[56] For the reasons explained below, I conclude that Carr's claims

---

[54] *Anglo Am. Sec. Fund, L.P. v. S.R. Glob. Int'l Fund, L.P.*, 829 A.2d 143, 150 (Del. Ch. 2003).

[55] *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004).

[56] *Id.* at 1039.

with respect to the Series A-2 Financing are derivative and his claims with respect to the Warrant Transaction are direct.

### 1.      The Series A-2 Financing

Carr contends that defendants executed the Series A-2 Financing to dilute unfairly certain other ACT stockholders, including himself.[57]  A claim for improper dilution is "a quintessential example of a derivative claim."[58]  In *Gentile v. Rossette*, however, the Delaware Supreme Court announced "one transactional paradigm" where an alleged improper dilution could be both direct and derivative in nature.[59] This dual status may exist where:  "(1) a *stockholder having majority or effective control* causes the corporation to issue 'excessive' shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange causes an increase in the percentage of the outstanding shares owned *by the controlling stockholder*, and a corresponding decrease in the share percentage owned by the public (minority) stockholders."[60]  In other words, as the emphasized language

---

[57] Compl. ¶ 58.

[58] *El Paso Pipeline GP Co., LLC v. Brinkerhoff*, 152 A.3d 1248, 1265 (Del. 2016) (Strine, C.J., concurring); *see also Green v. LocatePlus Holdings, Corp.*, 2009 WL 1478553, at *2 (Del. Ch. May 15, 2009) (citations omitted) ("Classically, Delaware law has viewed as derivative claims by shareholders alleging that they have been wrongly diluted by a corporation's overpayment of shares.").

[59] 906 A.2d 91, 99 (Del. 2006).

[60] *Id*. at 100 (emphasis added and citation omitted).

in the preceding quotation makes clear, to invoke the dual dynamic recognized in *Gentile*, a controlling stockholder must exist *before* the challenged transaction.

Here, Carr's invocation of *Gentile* to characterize as direct his claims challenging the Series A-2 Financing fails because the Complaint is devoid of any well-pled facts supporting the assertion that there was a controlling stockholder at the time of that transaction. The Complaint does not allege that NEA was a controlling stockholder before the Series A-2 Financing but rather that the Series A-2 Financing "*resulted in* NEA gaining ownership of more than 65% of ACT's stock an as-converted basis."[61] Carr also has failed to plead facts supporting his assertion that NEA and the Trust together constituted a controlling stockholder group before the Series A-2 Financing.

To adequately plead the existence of a control group, a plaintiff must allege that its members:

> [B]e connected in some legally significant way—such as by contract, common ownership, agreement, or other arrangement—to work together toward a shared goal. The law does not require a formal written agreement, but there must be some indication of an actual agreement. Plaintiffs must allege more than mere concurrence of self-

---

[61] Compl. ¶ 51 (emphasis added). NEA concedes it became ACT's controlling stockholder as a result of the Series A-2 Financing. *See* NEA Defs.' Opening Br. 22 n.12 ("As a result of the Series A-2 Financing, NEA owned 65% of ACT's issued and outstanding stock on an as-converted basis, and thus would be considered a controlling stockholder after that point in time.").

interest among certain stockholders to state a claim based on the existence of a control group.[62]

Carr contends that "[b]y March 17, 2014, shortly in advance of a refinancing led by NEA, the Defendants amended ACT's Amended and Restated Voting Agreement in a manner that changed the structure of the board of directors and, as a contractual matter, gave NEA complete control of [*sic*] over the board and reduced voting power from other stockholders."[63]  But this allegation mischaracterizes the plain terms of the March 17 amendment of the Voting Agreement.[64]

The March 17 amendment merely provides that NEA and the Trust agree that the "Preferred Designees" "shall be elected by the holders of a majority of the outstanding Preferred Stock of the Company" and that the initial "Preferred Designees" would be Pederson and one vacancy.[65]  Thus, the March 17 amendment only concerned two of the seven authorized slots on ACT's Board and plainly did not afford NEA and the Trust complete control over the Board.  Nothing else in the

---

[62] *In re Crimson Expl. Inc. Stockholder Litig.*, 2014 WL 5449419, at *15 (Del. Ch. Oct. 24, 2014) (citations and internal quotation marks omitted); *see also In re PNB Holding Co. S'holders Litig.*, 2006 WL 2403999, at *10 (Del. Ch. Aug. 18, 2006) (Strine, V.C.) ("Glomming share-owning directors together into one undifferentiated mass with a single hypothetical brain would result in an unprincipled Frankensteinian version of the already debatable 800-pound gorilla theory of the controlling stockholder.").

[63] Compl. ¶ 47.

[64] Ennis Aff. Ex. 12.

[65] *Id*.

March 17 amendment, moreover, otherwise could be said to constitute a pact for NEA and the Trust to work together to dilute unfairly ACT's other stockholders.

In sum, because Carr has not adequately pled that there was a controller at the time of the Series A-2 Financing, the transaction does not meet the paradigm described in *Gentile*, and his claims for improper dilution resulting from the Series A-2 Financing are derivative. Parenthetically, because the Complaint's allegations that the Trust was part of a control group with NEA are not well-plead, the Trust will be dismissed from this case because the only claims asserted against the Trust flow from this unsubstantiated premise.[66]

### 2. The Warrant Transaction

Carr argues that the sale of the "[W]arrant and the process (or lack of process) underlying it were the equivalent of an end-stage transaction in which a plaintiff alleges that breaches of fiduciary duty resulted in a change-of-control despite inadequate merger consideration and without adequate protections for individual stockholders who thus may bring claims directly."[67] Carr is correct that claims challenging the validity of a merger, usually by alleging breach of fiduciary duty, give rise to a direct claim.[68] The transaction here, however, is different from the

---

[66] *See* Compl. ¶¶ 109 (Count I), 121 (Count IV).

[67] Pl.'s Answering Br. 79.

[68] *See Parnes v. Bally Entm't Corp.*, 722 A.2d 1243, 1245 (Del. 1999) ("A stockholder who directly attacks the fairness or validity of a merger alleges an injury to stockholders, not the corporation, and may pursue such a claim even after the merger at issue has been

26

"fairly standard" ones "wherein the stockholders of one corporation (the 'target') receive consideration for agreeing to give up their shares in a merger with another corporation (the 'acquiror')."[69]

Here, in exchange for $25 million, Abbott purchased the *right* to buy ACT for a period of time for an up-front payment of $75 million plus potential milestone payments capped at total consideration of $185 million. Thus, the operative question is whether Carr "suffered harm independent of any injury to the corporation that would entitle him to an individualized recovery" due to the Warrant Transaction.[70] In my view, he has, so his claim is direct.[71]

If Carr was merely challenging the fairness of the $25 million purchase price of the Warrant, then his claims would fit the classic derivative mold of a company selling an asset too cheaply, because that consideration flowed directly to the Company, not the ACT stockholders.[72] The Warrant transaction was more

consummated. . . . In order to state a direct claim with respect to a merger, a stockholder must challenge the validity of the merger itself, usually by charging the directors with breaches of fiduciary duty resulting in unfair dealing and/or unfair price.").

[69] *Golaine v. Edwards*, 1999 WL 1271882, at *4 (Del. Ch. Dec. 21, 1999) (Strine, V.C.).

[70] *Feldman v. Cutaia*, 951 A.2d 727, 732 (Del. 2008).

[71] *See id*. at 733 ("In order to state a direct claim, the plaintiff must have suffered some individualized harm not suffered by all of the stockholders at large.").

[72] *See id.* (citation omitted) ("Where all of a corporation's stockholders are harmed and would recover *pro rata* in proportion with their ownership of the corporation's stock solely because they are stockholders, then the claim is derivative in nature."); *Cf. Metro Commc'ns Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 168 (Del. Ch. 2004) (Strine, V.C.) (citing *Tooley*, 845 A.2d 1031) ("Metro's complaint seeks damages

complicated than that, however, with the Board locking in an exercise price and milestone payments and providing Abbott the exclusive ability to buy the Company for approximately 30 months. Thus, the Warrant Transaction established the maximum price that the ACT stockholders might receive in an end-game transaction. To repeat, quantifying the alleged damages from approving the Warrant Transaction might be difficult, but Carr's underlying breach of fiduciary duty claims concerning the Warrant Transaction are akin to challenging the outcome of a merger and thus are direct.

* * * * *

As noted above, all six claims in the Complaint challenge the Series A-2 Financing and the Warrant Transaction together, with Counts I-III pled as direct claims and Counts IV-VI pled, in the alternative, as derivative claims. Each group of three claims also pleads claims in the alternative against NEA: Counts I and IV (breach of fiduciary duty) flow from the premise that NEA is a controlling stockholder of ACT and thus owes a fiduciary duty as a controller, while Counts III and VI (aiding and abetting) flow from the premise that it is not.

---

for lost profits because the bribery scheme deprived Fidelity Brazil of the possibility of going public. Distilled down, its theory is that the bribery scheme destroyed the economic value of Fidelity Brazil, preventing it from being a viable enough company to go public. Thus, the injury that Metro alleges, is, in the first instance, an injury to Fidelity Brazil itself and is therefore derivative in nature.").

Based on the conclusions I have reached so far, many of the claims in the Complaint can be disposed of in whole or in part. First, given my conclusion that the transactions must be analyzed separately and that the claims challenging the Series A-2 Financing are derivative while the claims challenging the Warrant Transaction are direct, Counts I-III must be dismissed insofar as they challenge the Series A-2 Financing and Counts IV-VI must be dismissed insofar as they challenge the Warrant Transaction. Second, given my conclusion that NEA was not a controlling stockholder at the time of the Series A-2 Financing, Count IV fails to state a claim for breach of fiduciary duty against NEA with respect to that transaction and thus Count IV must be dismissed in its entirety.[73] Third, given my conclusion that NEA was a controlling stockholder at the time of the Warrant Transaction, Count III fails to state a claim for aiding and abetting a breach of fiduciary duty against NEA with respect to that transaction and thus Count III must be dismissed its entirety.[74]

This leaves parts of four claims to be analyzed, specifically Counts V and VI with respect to the Series A-2 Financing, which occurred first in time, and Counts I

[73] *See Ivanhoe Partners v. Newmont Min. Corp.*, 535 A.2d 1334, 1344 (Del. 1987) (citations omitted) ("Under Delaware law a shareholder owes a fiduciary duty only if it owns a majority interest in or exercises control over the business affairs of the corporation.").

[74] *See Quadrant Structured Prods. Co., Ltd. v. Vertin*, 102 A.3d 155, 204 (Del. Ch. 2014) ("If a defendant has acted in a fiduciary capacity, then that defendant is liable as a fiduciary and not for aiding and abetting.").

and II with respect to the Warrant Transaction. The viability of those claims is addressed in that order in Sections C and D below.

**D.    Counts V and VI of the Complaint State Viable Claims for Relief Concerning the Series A-2 Financing**

Because the claims challenging the Series A-2 Financing are derivative, I address first whether Carr's failure to make a demand on the Board is excused for those claims. After finding for the reasons stated below that demand is excused, I address whether Counts V and VI state claims for relief under Court of Chancery Rule 12(b)(6) for breach of fiduciary duty and aiding and abetting, respectively, with respect to the Series A-2 Financing.

### 1.    Demand Is Excused for the Series A-2 Financing Claims

"A cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than stockholders, manage the business and affairs of the corporation."[75] Accordingly, stockholders may not prosecute a claim derivatively on behalf of a corporation unless they: "(1) make a pre-suit demand by presenting the allegations to the corporation's directors, requesting that they bring suit, and showing that they wrongfully refused to do so, or (2) plead facts showing that demand upon the board would have been futile."[76] Making a pre-suit demand is

---

[75] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984).

[76] *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 120 (Del. Ch. Feb. 24, 2009) (citing *Stone v. Ritter*, 911 A.2d 362, 366-67) (Del. 2006)).

futile when the directors upon whom the demand would be made "are incapable of making an impartial decision regarding such litigation."[77]

Because Carr did not make a demand on the Board before initiating this action, he must allege with particularity that his failure to do so with respect to the Series A-2 Financing should be excused.[78]  In this analysis, I accept as true Carr's particularized allegations of fact and draw all reasonable inferences that logically flow from those allegations in Carr's favor.[79]

Under Delaware law, depending on the factual scenario, there are two tests for determining whether demand may be excused:  the *Aronson* test and the *Rales* test.[80]  The test articulated in *Aronson v. Lewis*[81] applies when "a *decision* of the board of directors is being challenged in the derivative suit."[82]  The test set forth in *Rales v. Blasband*, on the other hand, governs when "the board that would be

---

[77] *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993).

[78] Ct. Ch. R. 23.1; Compl. ¶¶ 100-07.

[79] *White v. Panic*, 783 A.2d 543, 549 (Del. 2001).

[80] This court has noted in the past that, although "the *Rales* test looks somewhat different from *Aronson*, in that [it] involves a singular inquiry[,] . . . that singular inquiry makes germane all of the concerns relevant to both the first and second prongs of *Aronson*." *Guttman v. Huang*, 823 A.2d 492, 501(Del. Ch. 2003) (Strine, V.C.).

[81] 473 A.2d 805.

[82] *Rales*, 634 A.2d at 933 (emphasis in original).

considering the demand did not make a business decision which is being challenged in the derivative suit."[83] This situation arises "in three principle scenarios":

> (1) where a business decision was made by the board of a company, but a majority of the directors making the decision have been replaced; (2) where the subject of the derivative suit is not a business decision of the board; and (3) where . . . the decision being challenged was made by the board of a different corporation.[84]

Taking into account changes in board composition is critical to a demand futility analysis because "[w]hat, in the end, is relevant is not whether the board that approved the challenged transaction was or was not interested in that transaction but whether the present board is or is not disabled from exercising its right and duty to control corporate litigation."[85]

Here, the Board experienced turnover between its approval of the Series A-2 Financing and when Carr filed suit over three years later. On April 2, 2014, when the Series A-2 Financing was approved, the Board consisted of six members: Klein, Rohlen, Tanaka, Olson, Pederson, and Constantinides.[86] On May 18, 2017, when Carr filed the Complaint, the Board consisted of four members: Klein, Rohlen, Tanaka, and Drant. Thus, between these two events, three of six members (Olson, Pederson, and Constantinides) left the Board and a new director (Drant) was added.

---

[83] *Id.* at 933-34.

[84] *Id*. at 934 (citations omitted).

[85] *Harris v. Carter*, 582 A.2d 222, 230 (Del. Ch. 1990) (Allen, C.).

[86] Compl. ¶ 50.

32

Because there was turnover of less than a majority of the directors on the Board between the Series A-2 Financing and when the Complaint was filed, the *Aronson* test applies for claims concerning that transaction.[87]

To survive a motion to dismiss under the *Aronson* test, a plaintiff must plead facts that "raise a reasonable doubt as to (i) director disinterest or independence or (ii) whether the directors exercised proper business judgment in approving the challenged transaction."[88] The demand futility analysis "is conducted on a claim-by-claim basis" under Delaware law.[89] Thus, the court must consider whether the Board, at the time of the Complaint, could have impartially considered bringing actions against those Director Defendants who were on the Board when the Series A-2 Financing was approved (Count V) and against NEA (Count VI).

With respect to the claim against the Director Defendants, Carr has adequately pled that a majority of the four directors on the Board when he filed his Complaint was not disinterested or independent with respect to the Series A-2 Financing.[90] The

---

[87] *Rales*, 634 A.2d at 933-34.

[88] *Grobow v. Perot*, 539 A.2d 180, 186 (Del. 1998), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

[89] *Cambridge Ret. Sys. v. Bosnjak*, 2014 WL 2930869, at *4 (Del. Ch. June 26, 2014) (citing *Beam ex rel. Martha Stewart Omnimedia, Inc. v. Stewart*, 833 A.2d 961, 977 n.48 (Del. Ch. 2003) *aff'd*, 845 A.2d 1040 (Del. 2004)).

[90] *See Beam v. Stewart*, 845 A.2d at 1046 n.8 ("If three directors of a six person board are not independent and three directors are independent, there is not a majority of independent directors and demand would be futile.") (citing *Beneville v. York*, 769 A.2d 80, 85-86 (Del. Ch. 2000) (Strine, V.C.)); *In re the Limited, Inc. S'holders Litig.*, 2002 WL 537692, at *7

33

Complaint alleges, and defendants concede, that the April 2014 Consent approving the Series A-2 Financing expressly acknowledges that two of the directors on the Board when the Complaint was filed (Klein and Rohlen) were interested for purposes of the Series A-2 Financing, because Klein was "associated with and/or had a material financial interest in [NEA]" and Rohlen personally participated in the transaction.[91] Thus, demand is excused as to Count V for breach of fiduciary duty against the Director Defendants.

With respect to the claim against NEA, although the demand futility analysis typically is performed on a "claim-by-claim basis" as noted above, I do not believe that Klein and Rohlen could impartially decide whether to press an aiding and abetting claim against NEA when the predicate for such a claim is a breach of fiduciary duty by the Director Defendants (*i.e.*, a claim for which Klein and Rohlen are disabled from exercising disinterested and independent judgment on behalf of the Company for the reasons stated above). In any event, defendants concede that Klein would not be independent for purposes of evaluating a demand,[92] and Rohlen's

(Del. Ch. Mar. 27, 2002) (citation omitted) ("[W]here the challenged actions are those of a board consisting of an even number of directors, plaintiffs meet their burden of demonstrating the futility of making demand on the board by showing that half of the board was either interested or not independent.").

[91] Ennis Aff. Ex. 3 at ACT_220_000038 (April 2014 Consent); Compl. ¶ 54 (citing April 2014 Consent); NEA Defs.' Opening Br. 14 (same).

[92] *See* Director Defs.' Opening Br. 32-42 (Dkt. 33); Director Defs.' Reply Br. 10-17 (Dkt. 43). This concession is not surprising given that Klein was a partner on NEA's healthcare

34

status as the CEO of NEA-controlled ACT, in addition to his service on other NEA portfolio companies, creates a reasonable doubt about his independence from NEA.[93]

Accordingly, demand is excused as to Count VI for aiding and abetting against NEA.

### 2. Count V States a Claim for Breach of Fiduciary Duty Against the Director Defendants Regarding the Series A-2 Financing

The standards governing a motion to dismiss for failure to state a claim for relief under Court of Chancery Rule 12(b)(6) are well settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[94]

The standards are minimal, but the Court "will not credit conclusory allegations or draw unreasonable inferences in favor of the Plaintiffs."[95]

Carr alleges in the Complaint, and defendants concede, that the April 2014 Consent acknowledges that a majority of the Board (four out of six) who approved

---

team who served at various times on the boards of many NEA portfolio companies, including VytronUS and Topera.  Compl. ¶ 26.

[93] *See Sandys v. Pincus*, 152 A.3d 124, 128 (Del. 2016) (Strine, C.J.) ("Mattrick is Zynga's CEO.  Zynga's controlling stockholder, Pincus, is interested in the transaction under attack, and therefore, Mattrick cannot be considered independent.").

[94] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (citations omitted).

[95] *In re BJ's Wholesale Club, Inc. S'holders Litig.*, 2013 WL 396202, at *5 (Del. Ch. Jan. 31, 2013) (citation omitted).

the Series A-2 Financing was deemed interested in that transaction.[96]  As such, entire

fairness is the appropriate standard of review for analyzing this transaction.[97]

Defendants do not contend otherwise.[98]

"Entire fairness, Delaware's most onerous standard, applies when the board

labors under actual conflicts of interest.  Once entire fairness applies, the defendants

must establish 'to the court's satisfaction that the transaction was the product of both

fair dealing *and* fair price.'"[99]  Our Supreme Court explained the test in *Weinberger*

*v. UOP, Inc.*, as follows:

> The concept of fairness has two basic aspects:  fair dealing and fair
> price.  The former embraces questions of when the transaction was
> timed, how it was initiated, structured, negotiated, disclosed to the
> directors, and how the approvals of the directors and stockholders were

---

[96] Compl. ¶ 54; NEA Defs.' Opening Br. 14; Tr. 33 (Nov. 7, 2017).

[97] *See In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 43 (Del. Ch. 2013) ("[T]he Board lacked a majority of disinterested and independent directors, making entire fairness the applicable standard.").

[98] Citing the April 2014 Consent, NEA asserts that the "Series A-2 Financing was considered and approved by directors Olson and Tanaka, neither of whom participated in the financing and both of whom were independent of NEA at the time of the financing, before it was submitted to the full ACT Board for approval."  NEA Defs.' Opening Br. 29. The April 2014 Consent states that the Board decided that Olson and Tanaka should approve the Series A-2 Financing "to meet the requirement of a disinterested director approval for purposes of compliance with Section 144 of the Delaware General Corporation Law."  Ennis Aff. Ex. 3 at ACT_220_000038.  Defendants presented no argument in their briefs, however, concerning the potential legal impact of such an approval, and the Complaint makes no reference to a separate vote by Olson and Tanaka. Thus, I decline to consider this issue for purposes of deciding the pending motions to dismiss.  *See Emerald Partners v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[99] *In re Trados*, 73 A.3d at 44 (emphasis in original) (quoting *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1163 (Del. 1995)).

obtained. The latter aspect of fairness relates to the economic and financial considerations of the proposed [transaction], including all relevant factors . . . However, the test for fairness is not a bifurcated one as between fair dealing and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness.[100]

"Not even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness. Rather, the transaction itself must be objectively fair, independent of the board's beliefs."[101]

Application of the entire fairness standard "does not mean that the . . . directors necessarily breached their fiduciary duties, only that entire fairness is the lens through which the court evaluates their actions."[102] Nevertheless, "as a practical matter," application of the entire fairness standard typically precludes dismissal under Rule 12(b)(6), because "[a] determination of whether the defendant has met that burden will normally be impossible by examining only the documents the Court is free to consider on a motion to dismiss—the complaint and any documents it incorporates by reference."[103]

---

[100] 457 A.2d 701, 711 (Del. 1983) (citations omitted).

[101] *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1145 (Del. Ch. 2006).

[102] *In re Trados*, 73 A.3d at 45.

[103] *Orman v. Cullman*, 794 A.2d 5, 21 n.36 (Del. Ch. 2002).

In my opinion, Carr has alleged sufficient specific facts that call into question the fairness of both the process and the price of the Series A-2 Financing.[104] With respect to process, the Series A-2 Financing was approved by a compromised Board without the benefit of a financial advisor or a fairness opinion.[105] It involved the issuance of preferred stock to a select group of investors, including four of the directors and/or their affiliates, and it allowed NEA to become ACT's controlling stockholder.[106] The fact that NEA was permitted to obtain nearly 90% of the Series A-2 preferred stock, increasing its stake in ACT to more than 65% on an as-converted basis, segues into Carr's allegation that the Series A-2 stock was offered at an unfairly low price.[107]

Control of a corporation has unique value, and one would expect an acquirer to pay a premium for that control.[108] Here, it is alleged that the Series A-2 Financing placed an approximately $15 million valuation on ACT,[109] yet the Warrant exercise price ($75 million) proposed less than three months later in Abbott's June 30, 2014

---

[104] *See In re Boston Celtics Ltd. Partnership S'holders Litig.*, 1999 WL 641902, at *4 (Del. Ch. Aug. 6, 1999) (citation omitted) ("[I]t . . . is necessary for the plaintiff to allege specific items of misconduct that demonstrate unfairness, in order to survive a motion to dismiss.").

[105] Tr. 33-34 (Nov. 7, 2017).

[106] Compl. ¶¶ 65, 77, 85; Tr. 34 (Nov. 7, 2017).

[107] Compl. ¶¶ 51, 73.

[108] *See IRA Trust FBO Bobbie Ahmed v. Crane*, 2017 WL 7053964, at *7 n.54 (Del. Ch. Dec. 11, 2017) ("That control of a corporation has value is well-accepted.").

[109] Compl. ¶ 51.

LOI was five-times that amount.[110]  Such a gap in value in the span of just a few months, without any allegations about intervening events that increased ACT's value meaningfully, supports an inference that NEA was able to gain control on the cheap through the Series A-2 Financing.

Given the specific facts pled in the Complaint about the process and price of the Series A-2 Financing, it is certainly reasonably conceivable that the Series A-2 Financing was not entirely fair.  Accordingly, Count V states a claim for breach of fiduciary duty against the Director Defendants with respect to their approval of the Series A-2 Financing.[111]

### 3.   Count VI States a Claim for Aiding and Abetting Against NEA Regarding the Series A-2 Financing

In Count VI of his Complaint, Carr alleges that NEA aided and abetted the Board's breach of its fiduciary duty by approving the Series A-2 Financing.  "A third party may be liable for aiding and abetting a breach of a corporate fiduciary's duty to the stockholders if the third party knowingly participates in the breach.  To survive a motion to dismiss, the complaint must allege facts that satisfy the four elements of an aiding and abetting claim:  (1) the existence of a fiduciary relationship, (2) a

---

[110] Compl. ¶¶ 50, 59.

[111] I consider in Section F below whether certain Director Defendants who approved the Series A-2 Financing may be dismissed for failure to plead a non-exculpated claim against them.

breach of the fiduciary's duty, (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach."[112]

For the reasons explained above, Carr has pled adequately that the Board owed a fiduciary duty to ACT, which it breached in approving the Series A-2 Financing. Carr also has alleged that this transaction unfairly and cheaply diluted him and other minority stockholders.[113] Accordingly, the key question is whether Carr has pled facts such that it is reasonably conceivable that NEA knowingly participated in the Board's alleged breach of fiduciary duty.

In *Malpiede v. Townson*, our Supreme Court explained the meaning of "knowing participation" in the context of a claim for aiding and abetting a breach of fiduciary duty:

> Knowing participation in a board's fiduciary breach requires that the third party act with knowledge that the conduct advocated or assisted constitutes such a breach. Under this standard, a bidder's attempts to reduce the sale price through arm's-length negotiations cannot give rise to liability for aiding and abetting, whereas a bidder may be liable to the target's stockholders if the bidder attempts to create or exploit conflicts of interest in the board.[114]

"A claim of knowing participation need not be pled with particularity. However, there must be factual allegations in the complaint from which knowing

---

[112] *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001) (citations, internal quotations, and alterations in original omitted).

[113] Compl. ¶¶ 1, 4.

[114] 780 A.2d at 1097 (citations omitted).

participation can be reasonably inferred."[115]  A director's knowledge and participation in a breach may be imputed to a non-fiduciary entity for which that director also serves in a fiduciary capacity.[116]

Viewing the facts alleged in the light most favorable to Carr, as I must at this stage of the proceedings, I find that Carr has adequately pled that NEA knowingly participated in the Board's breach.  Klein served as both an ACT director and an NEA partner, so his alleged knowing participation in the Board's breach of its fiduciary duty with respect to the Series A-2 Financing may be imputed to NEA. The Complaint alleges that both NEA and Klein had a financial incentive to dilute cheaply ACT stockholders to gain control of the Company at an unfairly low price, and that NEA exploited conflicts of interest on the Board by deploying Klein to facilitate a transaction purportedly unfair to the existing ACT stockholders.[117]  These interactions between ACT and NEA, which acquired 90% of the Series A-2 Preferred Stock, "amount to more than simple arm's-length negotiations,"[118] since Klein's venture capital firm, where he is a partner, wanted NEA to acquire the

---

[115] *In re Gen. Motors (Hughes) S'holder Litig.*, 2005 WL 1089021, at *24 (Del. Ch. May 4, 2005) (citation and internal quotation marks omitted).

[116] *See, e.g.*, *Carlson v. Hallinan*, 925 A.2d 506, 542 (Del. Ch. 2006); *Khanna v. McMinn*, 2006 WL 1388744, at *27 (Del. Ch. May 9, 2006).

[117] Compl. ¶¶ 4, 26, 49, 51, 54.

[118] *In re USACafes, L.P. Litig.*, 600 A.2d 43, 56 (Del. Ch. 1991) (Allen, C.); *see id.* (finding that plaintiff stated a claim for aiding and abetting breach of fiduciary duty).

preferred stock at the lowest possible valuation.  Accordingly, I find it reasonably conceivable that NEA aided and abetted the Board's breach of fiduciary duty.

\* \* \* \* \*

In sum, with respect to Carr's allegations regarding the Series A-2 Financing, I find that demand is excused with respect to these claims, and that the Complaint states claims of breach of fiduciary duty against the Director Defendants and aiding and abetting a breach of fiduciary duty against NEA.  Thus, defendants' motion to dismiss Counts V and VI is denied insofar as those claims concern the Series A-2 Financing.

### E. Counts I and II of the Complaint State Viable Claims for Relief Concerning the Warrant Transaction

In this section I consider whether Carr has stated a direct claim for breach of fiduciary duty under Counts I and II of the Complaint with respect to the Warrant Transaction.  I begin with analyzing the claim against the Director Defendants (Count II) and then turn to the claim against NEA (Count I) as the Company's controlling stockholder.

#### 1. Count II States a Claim for Breach of Fiduciary Duty Against the Director Defendants Regarding the Warrant Transaction

"Delaware has three tiers of review for evaluating director decision-making: the business judgment rule, enhanced scrutiny, and entire fairness."[119]  *Revlon* and

---

[119] *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 443, 457 (Del. Ch. 2011).

its progeny teach that enhanced scrutiny applies to transactions that effect a change of corporate control.[120] This case, however, presents an unusual fact pattern for determining whether *Revlon* should apply to evaluate Carr's challenge to the Director Defendants' decision to approve the Warrant Transaction.

Two attributes of the Warrant Transaction complicate the inquiry. First, the transaction involved the potential sale of a corporation (ACT) to a third-party (Abbott) with the blessing of a controlling stockholder (NEA), where the Company's directors realistically had little—if any—ability to seek alternatives to maximize value for the minority stockholders beyond what the controller was willing to accept. Second, the potential sale of ACT was just that—*potential*. The Warrant Transaction afforded Abbott *an option* to acquire ACT for a 30-month period to the exclusion of other bidders for specified economic terms, meaning that the transaction might or might not ultimately result in a sale of the corporation and the elimination of the minority stockholders' interests in the Company.

No authority has been brought to the court's attention addressing a scenario where both of these features were present, although there are cases that have addressed the application of *Revlon* duties in circumstances implicating one feature or the other. I consider these two lines of cases next.

---

[120] *Paramount Commc'ns Inc. v. QVC Network, Inc.*, 637 A.2d 34, 36 (Del. 1994); *Paramount Comm'cns, Inc. v. Time Inc.*, 571 A.2d 1140, 1150-51 (Del. 1989); *Revlon*, 506 A.2d at 182.

The first line comes from our Supreme Court's decision in *McMullin v. Beran*, which considered what duty a board of directors owes to minority stockholders when evaluating a proposal for a sale of the entire corporation to a third party at the behest of a controller.[121] There, ARCO owned approximately 80% of the common stock of Chemical, and Lyondell reached out to ARCO about acquiring all of Chemical.[122] With the Chemical board's blessing, ARCO negotiated a two-step merger with Lyondell.[123] When considering the obligations the Chemical board owed to its minority stockholders in the context of a third-party sale, the Supreme Court held that "the ultimate focus on maximization is the same as if the board itself had decided to sell the corporation to a third party."[124] The Court explained:

> When the entire sale to a third-party is proposed, negotiated and timed by a majority shareholder . . . the board cannot realistically *seek* any alternative because the majority shareholder has the right to vote its shares in favor of the third-party transaction it proposed for the board's consideration. Nevertheless, in such situations, the directors are obliged to make an informed and deliberate judgment, in good faith, about whether the sale to a third party that is being proposed by the majority shareholder will result in a maximization of value for the minority shareholders.[125]

---

[121] 765 A.2d 910, 918-19 (Del. 2000).

[122] *Id*. at 915.

[123] *Id*. at 915-16.

[124] *Id*. at 919 (citing *Mendel v. Carroll*, 651 A.2d 297, 305 (Del. 1994)).

[125] *Id*. (emphasis in original and citations omitted).

Thus, as the Supreme Court further explained, although the Chemical board "did not have the ability to *act* on an informed basis to *secure* the best value reasonably available for all shareholders in any alternative" transaction, the Chemical board had "the duty to act on an informed basis to independently ascertain how the merger consideration being offered in the third party Transaction with Lyondell compared to Chemical's value as a going concern."[126]  This duty emanates from the directors' "ultimate statutory duties under Section 251 and attendant fiduciary obligations,"[127] and directors have "a duty to fulfill this obligation faithfully and with due care so that the minority shareholders would be able to make an informed decision about whether to accept the Lyondell Transaction tender offer price or to seek appraisal of their shares."[128]

Noting that the transaction at issue involved "the entire sale of Chemical to Lyondell" rather than the sale only of ARCO's own 80% interest in Chemical, the Supreme Court agreed with plaintiff's contention that the transaction "implicated the

---

[126] *Id.* (emphasis in original); *see id.* at 920 (citations omitted) ("When a majority of a corporation's voting shares are owned by a single entity, there is a significant diminution in the voting power of the minority stockholders.  Consequently, minority stockholders must rely for protection on the fiduciary duties owed to them by the board of directors.").

[127] *Id.* at 920; *see also id.* at 917 (citing *Smith v. Van Gorkom*, 488 A.2d 858, 873 (Del. 1985); *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 721-22 (Del. 1971)) (describing 8 *Del. C.* § 251 as imposing a duty "to act in an informed and deliberate manner in determining whether to approve an agreement of merger before submitting the proposal to the stockholders").

[128] *Id.* at 920.

45

directors' ultimate fiduciary duty that was described in *Revlon* and its progeny—to focus on whether shareholder value has been maximized."[129]  Nevertheless, the Supreme Court did not place the burden on the directors to show that they had acted reasonably in approving a transaction that maximized value for all stockholders, as *Revlon* would require, but held instead that plaintiff's complaint "would withstand a motion to dismiss if it successfully alleged facts that, if true, would rebut the procedural protections of the business judgment rule."[130]  The Supreme Court then reviewed the allegations of plaintiff's complaint within the business judgment rule framework and found them sufficient to state claims for breach of the duties of care and loyalty.[131]

The second line of cases emanates from Chancellor Allen's decision in *Equity-Linked Investors, L.P. v. Adams*.[132]  There, the court faced a conflict between holders of convertible preferred stock with a liquidation preference and common stock.[133]  The subject company, Genta, was a bio-pharmaceutical company on the cusp of insolvency but which had several promising technologies.[134]  Genta secured

---

[129] *Id.* (citation omitted).

[130] *Id.*

[131] *Id.* at 921-25.

[132] 705 A.2d 1040 (Del. Ch. 1997).

[133] *Id.* at 1042.

[134] *Id.* at 1041.

third-party financing from Aries in exchange for a note, warrants exercisable into half of Genta's outstanding stock, and other consideration including the right to designate a majority of the board of directors.[135] Plaintiff, a lead holder of preferred stock with a small common stock position,[136] challenged the transaction based on a *Revlon* theory:

> The claim now is that the board "transferred control" of the company and that in such a transaction it is necessary that the board act reasonably to get the highest price, which this board did not do. Plaintiff urges that the special duty recognized in *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.* arose here because (1) Aries has a contract right to designate a majority of the Genta board and (2) Aries acquired warrants that if exercised would give it the power to control any election of the Genta board.[137]

Chancellor Allen "assume[d] for purposes of deciding this case, without deciding, that the granting of immediately exercisable warrants, which, if exercised, would give the holder voting control of the corporation, is a transaction of the type that warrants the imposition of the special duties and special review standard of *Paramount*,"[138] *i.e.*, *Revlon* duties.[139] He described these duties as follows:

> (1) where a transaction constituted a "change in corporate control," such that the shareholders would thereafter lose a further opportunity to participate in a change of control premium, (2) the board's duty of

---

[135] *Id*. at 1041-42.

[136] *Id*. at 1042.

[137] *Id*. at 1053.

[138] *Paramount Commc'ns v. QVC*, 637 A.2d 34.

[139] *Equity-Linked Inv'rs*, 705 A.2d at 1055.

loyalty requires it to try in good faith to get the best price reasonably available (which specifically means the board must at least discuss an interest expressed by any financially capable buyer), and (3) in such context courts will employ an (objective) "reasonableness" standard (both to the process and the result!) to evaluate whether the directors have complied with their fundamental duties of care and good faith (loyalty).[140]

Applying this *Revlon* lens to the challenged financing after trial, Chancellor Allen found that the board met its "special duties,"[141] but he did not provide any further commentary on whether or when a warrant sale resulting in a potential transfer of control triggers *Revlon* duties.

Thirteen years after *Equity-Linked*, this court confronted a similar situation in *Binks v. DSL.net, Inc.*[142] There, DSL was experiencing dire financial stress, and its board decided to secure financing from MegaPath in the form of convertible notes rather than filing for bankruptcy.[143] By exercising its conversion rights under the notes over the course of a few months, MegaPath obtained more than 90% of DSL's common stock and then eliminated the minority stockholders via a short-form merger.[144] Plaintiff brought an action *pro se* alleging that DSL's board breached its fiduciary duty by failing to obtain the best price reasonably available for

---

[140] *Id.* at 1054-55.

[141] *Id.* at 1053, 1059.

[142] 2010 WL 1713629 (Del. Ch. Apr. 29, 2010).

[143] *Id.* at *1.

[144] *Id.*

stockholders in the context of a change of control transaction, as required under

*Revlon*.[145]    When considering the appropriate standard of review, the court

commented:

> It is, perhaps, easy to doubt the assumption that the MegaPath Financing Transaction—a debt placement that occurred more than six months before the short-form Merger and which was entered into without any express guarantee that the Merger would occur—should be assessed under any special standard. Yet, the Court is mindful that it is reviewing the efforts of a self-represented plaintiff, and it is not unreasonable to review the Amended Complaint as alleging that the short-form Merger was an inevitable and foreseeable consequence of the MegaPath Financing Transaction. As the Supreme Court in *QVC* pointed out, in determining whether the transaction constitutes a "change in control" for *Revlon* purposes, "the answer must be sought in the specific circumstances surrounding the transaction."[146]

Based on the "specific circumstances" surrounding the transaction, the court

assumed, without deciding, that the financing was subject to review under the *Revlon*

standard, citing *Equity-Linked Investors* approvingly.[147]  Applying this standard, the

court still granted defendants' motion to dismiss plaintiff's *Revlon* claim, because

"the Board was independent and disinterested with respect to the MegaPath

---

[145] *Id.* at *1, 5.

[146] *Id.* at *6 (citing *Paramount Commc'ns v. QVC*, 637 A.2d at 46).

[147] *Id.* at *6-7; *see also id.* at *7 ("Evaluating the MegaPath Financing Transaction under the *Revlon* standard also has the advantage of giving Binks the most favorable analytical framework for assessment of his claims. It additionally would make the fiduciary duty claims that compromise the core of the Amended Complaint at least arguably direct. If the MegaPath Financing Transaction were evaluated outside the context of the short-form Merger, the Board's failures, assuming that there were any, might well be viewed as giving rise only to derivative claims.").

Financing Transaction, was well informed by independent advisors of the available alternatives to the Company besides its ultimate sale to MegaPath, and acted in good faith in arranging and committing the Company to that transaction, especially in light of the circumstances and the paucity of other options available to DSL."[148]

*Equity-Link* and *Binks* support the proposition that it would be appropriate to apply the intermediate scrutiny of *Revlon*, at least in certain circumstances, to evaluate a board's decision to grant a third-party *an option* to acquire control of a corporation, as opposed to a decision to sell the corporation outright. Indeed, if that were not the case, a party could seek to evade the special protections *Revlon* affords stockholders through creative structuring of a transaction (*e.g.*, an unconditional, immediately exercisable option to purchase the entire company) that in substance is equivalent to an outright sale of the corporation. That would be an absurd result.

On the other hand, the application of *Revlon* to an option transaction likely would turn on the conditionality and other specific features of the option in question. Here, for example, defendants argue that *Revlon* should not apply because "Abbott's exercise of the Warrant option to purchase ACT was contingent on the occurrence of material contingencies that neither ACT nor Abbot controlled, and that were far from inevitable," including the need for regulatory approval and ACT's delivery to

---

[148] *Id.* at *7.

Abbott of "specified human clinical trial data relating to" a "specific ablation catheter product."[149]

* * * * *

These two lines of cases, taken together, suggest that the board of directors of a controlled company *may* have *Revlon*-like duties when deciding to approve the sale of an option to a third party to purchase the entire company. Here, however, I do not need to determine whether the Board's approval of the Warrant Transaction is subject to a form of enhanced scrutiny, because even under the business judgment rule—the most defendant-friendly standard of review—Carr has stated a claim for relief against the Director Defendants in my opinion.

The business judgment rule provides a presumption that the board made such a decision "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[150] A complaint can survive a motion to dismiss if a plaintiff has adequately pled that the directors breached their duty of care or loyalty in coming to that determination. Here, Carr has pled facts such that it is reasonably conceivable that the Director Defendants breached both of these duties in connection with their approval of the Warrant Transaction so as to rebut the business judgment rule.

---

[149] Letter from Defs. (Dec. 8, 2017) 4 (Dkt. 61).

[150] *Aronson*, 473 A.2d at 812 (citation omitted).

With respect to the duty of care, Carr has pled that Medtronic's letter of intent was objectively superior to Abbott's proposal, yet the Board did not pursue a transaction with Medtronic or use Medtronic's proposal to attempt to extract a higher price from Abbott before approving the Warrant Transaction several months later, after Abbott's letter of intent's 60-day exclusivity period had expired.[151] Additionally, as pled and reflected in its minutes, the Board did not implement any formal process in selling the Warrant, nor did it even engage a financial advisor.[152] These factors, taken together, suggest that the Board may have been grossly negligent in executing the potentially game-ending Warrant Transaction.[153]

With respect to the duty of loyalty, Carr has rebutted the business judgment rule because he has pled facts showing that at least half of the six-person board that approved the Warrant Transaction was not disinterested or independent.[154] At the

---

[151] Compl. ¶ 68.

[152] Compl. ¶¶ 59-77; Tr. (Nov. 7, 2017) 33-34; Ennis Aff. Exs. 6, 8.

[153] *See McMullin*, 765 A.2d at 921 (citation and internal quotation marks omitted) ("Director liability for breaching the duty of care is predicated upon concepts of gross negligence."); *see also id*. at 921-22 (finding that plaintiff adequately pleaded a claim for breach of the duty of care when, *inter alia*, there was a lack of procedural safeguards to protect the interests of the minority stockholders, the board only met one time to consider the transaction, and the sale process was rushed).

[154] *See Beam v. Stewart*, 845 A.2d at 1046 n.8 (citing *Beneville*, 769 A.2d at 85-86) ("If three directors of a six person board are not independent and three directors are independent, there is not a majority of independent directors and demand would be futile"); *In re the Limited*, 2002 WL 537692, at *7 (citation omitted) ("[W]here the challenged actions are those of a board consisting of an even number of directors, plaintiffs meet their

time of the transaction, ACT itself represented that both Klein and Pederson were tainted, because Klein was an NEA partner and Pederson was the President and CEO of VytronUS and was discussing potential employment with Abbott.[155]  Rohlen also was not independent and disinterested in my view, because he was the CEO of the NEA-controlled Company.[156]   The director's conflicts arising from their relationships with NEA are salient because, as discussed below, NEA itself allegedly was motivated to accept less than fair value for its shares of ACT in order to benefit from Abbott's acquisition of Topera and investment in VytronUS.   Thus, the directors' conflicts of interest provide a sufficient and independent basis for Carr's claims against the Director Defendants regarding the Warrant Transaction to survive a motion to dismiss.[157]

---

burden of demonstrating the futility of making demand on the board by showing that half of the board was wither interested or not independent.").

[155] Compl. ¶¶ 66-67.

[156] *See Sandys*, 152 A.3d at 128 ("Mattrick is Zynga's CEO.  Zynga's controlling stockholder, Pincus, is interested in the transaction under attack, and therefore, Mattrick cannot be considered independent.").

[157] Defendants argue that the business judgment rule should apply because a group of four "Disinterested Directors"—Rohlen, Constantinides, Olson, and Tanaka—approved the Warrant Transaction before the transaction was submitted to the Board.  NEA Defs.' Opening Br. 40; Ennis Aff. Ex. 8 at ACT_220_000177.  This fact is not pled in the Complaint.  In any event, I disagree with defendants' contention that Rohlen was independent and disinterested for the reasons explained above.

### 2. Count I States a Claim for Breach of Fiduciary Duty Against NEA as a Controlling Stockholder Regarding the Warrant Transaction

In Count I of the Complaint, Carr asserts that NEA breached its fiduciary duty as the controlling stockholder of ACT with respect to the Warrant Transaction.

A controlling stockholder owes fiduciary duties to the corporation and its minority stockholders, and it is "prohibited from *exercising corporate power* (either formally as directors or officers or informally through control over officers and directors) so as to advantage [itself] while disadvantaging the corporation."[158]  A controlling stockholder has the right to act in its own self-interest when it is acting solely in its capacity as a stockholder.[159]  This right must yield, however, when a corporate decision implicates a controller's duty of loyalty.[160]

---

[158] *Thorpe v. CERBCO, Inc.*, 1995 WL 478954, at *8 (Del. Ch. Aug. 9, 1995) (Allen, C.) (emphasis in original), *aff'd in part, rev'd in part*, 676 A.2d 436 (Del. 1996).

[159] *Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 440-41, 443-44 (Del. 1996); *see In re CompuCom Sys., Inc. S'holders Litig.*, 2005 WL 2481325, at *6 (Del. Ch. Sept. 29, 2005) (citation omitted) ("Generally speaking, a controlling shareholder has the right to sell his control share without regard to the interests of any minority shareholder, so long as the transaction is undertaken in good faith.").

[160] *Thorpe v. CERBCO*, 676 A.2d at 442; *see also Abraham v. Emerson Radio Corp.*, 901 A.2d 751, 759 (Del. Ch. 2006) (Strine, V.C.) ("I am dubious that our common law of corporations should recognize a duty of care-based claim against a controlling stockholder for failing to (in a court's judgment) examine the bona fides of a buyer, at least when the corporate charter contains an exculpatory provision authorized by 8 *Del. C.* § 102(b)(7). After all, the premise for contending that the controlling stockholder owes fiduciary duties in its capacity as a stockholder is that the controller exerts its will over the enterprise in the manner of the board itself.  When the board itself is exempt from liability for violations of the duty of care, by what logic does the judiciary extend liability to a controller exercising its ordinarily unfettered right to sell its shares?").

54

This court's decision in *In re BHC Communications, Inc. Shareholder Litigation*[161] is instructive to my analysis here. There, plaintiffs challenged a series of mergers between an unrelated acquirer—News Corporation—and three corporations that together comprised a "family" of entities.[162] That family consisted of Chris-Craft, a holding company, which owned a majority stake in BHC, which, in turn, owned a majority stake in UTV.[163] The gravamen of plaintiffs' theory was that Chris-Craft, as a controller, breached its fiduciary duty by using "its dominant position to exert exclusive control over the negotiations with News Corporation and used that control to unfairly allocate 'the aggregate consideration News Corporation was willing to pay for [all three] companies . . . [to] favor its own shareholders at the expense of BHC's [and UTV's] minority shareholders.'"[164] The court held "there is little doubt that" if such a theory was adequately pled, it "should deny the motions to dismiss."[165]

---

[161] 789 A.2d 1 (Del. Ch. 2001).

[162] *Id*. at 4.

[163] *Id*. at 5.

[164] *Id.* at 7-8 (alterations in original); *see id.* at 12 ("To support their claim of self-dealing, plaintiffs argue that, since the total amount News Corporation was willing to pay 'was not unlimited,' 'the more Chris-Craft shareholders would receive necessarily and adversely impacted on the consideration News was willing to pay to [the] minority shareholders.'").

[165] *Id*. at 12.

The thrust of Carr's theory here is analogous to plaintiffs' theory in *BHC*. Carr alleges that NEA breached its fiduciary duty as a controller by taking advantage of its dominant position and engaging in self-dealing. Specifically, the Complaint alleges that NEA engaged in a form of portfolio optimization by selling the Warrant to acquire ACT on the cheap to Abbott in order to incentivize Abbott to undertake transactions favorable to NEA with respect to two of its other portfolio companies; namely for Abbott to acquire Topera and invest in VytronUS. Carr alleges, in essence, that NEA prioritized its fund's overall rate of return over maximizing value for ACT's stockholders. This is precisely the kind of behavior that controllers may not engage in under Delaware law. Accordingly, Count I of the Complaint states a claim that NEA breached its fiduciary duty as a controller with respect to the Warrant Transaction.

\* \* \* \* \*

In sum, with respect to Carr's allegation regarding the Warrant Transaction, I find that the Complaint has stated claims of breach of fiduciary duty against the Director Defendants and NEA as ACT's controlling stockholder. Thus, defendants' motion to dismiss Counts I and II is denied.

### F. The Complaint Fails to Plead Non-Exculpated Claims Against Certain Director Defendants

In its *Cornerstone* decision, our Supreme Court made clear that a "plaintiff seeking only monetary damages must plead non-exculpated claims against a director

56

who is protected by an exculpatory charter provision to survive a motion to dismiss, regardless of the underlying standard of review for the board's conduct—be it *Revlon*, *Unocal*, the entire fairness standard, or the business judgment rule."[166]  The Supreme Court further explained what is entailed in making this showing:

> When a director is protected by an exculpatory charter provision, a plaintiff can survive a motion to dismiss by that director defendant by pleading facts supporting a rational inference that the director harbored self-interest adverse to the stockholders' interests, acted to advance the self-interest of an interested party from whom they could not be presumed to act independently, or acted in bad faith.[167]

ACT's certificate of incorporation exculpates its directors for breaches of their duty of care.[168]  Based on this provision, defendants argue that certain Director Defendants must be dismissed under *Cornerstone* because the Complaint fails to plead facts supporting a non-exculpated claim against them with respect to the Series A-2 Financing (Tanaka and Olson) and/or the Warrant Transaction (Tanaka, Olson, Constantinides, and Rohlen).  Carr makes no argument that any of these individuals acted in bad faith with respect to either transaction but argues that they should not be dismissed because each of them "was either interested in the transactions at issue

---

[166] *In re Cornerstone Therapeutics Inc., Stockholder Litig.*, 115 A.3d 1173, 1175-76 (Del. 2015) (Strine, C.J.) (citations omitted).

[167] *Id.* at 1179-80 (citation omitted).

[168] Ennis Aff. Ex. 10 Art. VIII.

or beholden to an interested party."[169] I consider these contentions for each director below.

### 1. Tanaka and Olson

For purposes of both the Series A-2 Financing and the Warrant Transaction, Carr argues that Tanaka and Olson were beholden to NEA because they both were "economically dependent on NEA."[170] Specifically, Carr points to the fact that Tanaka was "a director of multiple NEA-portfolio companies, including Vytron[US]," and, with respect to Olson, that the vesting of stock options governed by his Consulting Agreement with ACT was conditioned on his continued service as a consultant which, in turn, was subject to the approval of a board that would be under NEA control after the Series A-2 Financing.[171]

Importantly, however, "[c]onsistent with the overarching requirement that any disqualifying tie be material, the simple fact that there are some financial ties between the interested party and the director is not disqualifying. Rather, the question is whether those ties are *material*, in the sense that the alleged ties could have affected the impartiality of the director."[172] Here, Carr has not pled facts such

---

[169] Pl's Answering Br. 82.

[170] Pl.'s Answering Br. 18.

[171] Pl.'s Answering Br. 18.

[172] *In re MFW S'holders Litig.*, 67 A.3d 496, 509-10 (Del. Ch. 2013) (Strine, C.) (emphasis in original and citation omitted).

that it would be reasonable to infer that Tanaka's compensation as a VytronUS director or Olson's stock options in ACT were material to them so as to taint their decision-making. Thus, Tanaka and Olson will be dismissed from this action because of the Complaint's failure to plead a non-exculpated claim against them with respect to either the Series A-2 Financing or the Warrant Transaction.

### 2. Constantinides and Rohlen

Carr contends that Constantinides was tainted with respect to the Warrant Transaction because of "a series of events involving economic dependency between NEA and Constantinides's employer at the time, NBGI, as well as the structure of their plan that contemplated distributions to both of them out of the warrant purchase money from Abbott."[173] This argument fails because Carr does not plead sufficient facts permitting an inference that the ties between NEA and NBGI reach the threshold required for materiality as to Constantinides. Carr has adequately pled, however, that Rohlen was not independent with respect to the Warrant Transaction since he was the CEO of NEA-controlled ACT at the time[174] and, for reasons explained above, the Complaint states a claim against NEA for breach of its fiduciary duty as a controller in connection with the Warrant Transaction.

---

[173] Pl.'s Answering Br. 38.

[174] *See Sandys*, 152 A.3d at 128 ("Mattrick is Zynga's CEO. Zynga's controlling stockholder, Pincus, is interested in the transaction under attack, and therefore, Mattrick cannot be considered independent.").

To summarize, the Complaint fails to plead a non-exculpated claim against Constantinides with respect to the Warrant Transaction but does so with respect to Rohlen. Notwithstanding this conclusion insofar as Constantinides is concerned, he will not be dismissed from this action because no argument has been made that the Complaint fails to plead a non-exculpated claim against him with respect to the Series A-2 Financing.

## IV.    CONCLUSION

For the reasons explained above, defendants' motion to dismiss is GRANTED as to Counts III and IV and DENIED as to Counts I, II, V, and VI, which shall proceed in the manner described above. The Trust, Kendall Simpson Rohlen (who was sued solely as a trustee of the Trust), Tanaka, and Olson are dismissed from this action.

**IT IS SO ORDERED.**